**FILED**
Oct 19, 2009
OCT 19 2009

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE REBECCA R. PALLMEYER
UNITED STATES DISTRICT COURT

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 08 CR 685 |
| vs. | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| FREDDY CAZARES | ) | |

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant FREDDY CAZARES, and his attorney, ROSE LINDSAY, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2. The indictment in this case charges defendant with attempting to possess with the intent to distribute a controlled substance, namely, in excess of 5 kilograms of mixtures containing cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 846.

3. Defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crime with which he has been charged.

## Charge to Which Defendant is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the indictment. The indictment charges defendant with attempting to possess with the intent to distribute in excess of 5 kilograms of cocaine, in violation of Title 21, United States Code, Section 846. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charge contained in the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the funds and property described elsewhere in this Plea Agreement:

On or about August 29, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, FREDDY CAZARES, did attempt to knowingly and intentionally possess with intent to distribute a controlled substance, namely, in excess of 5 kilograms of mixtures and substances containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846.

More specifically, on or about August 13, 2008, CAZARES met with an individual who, unbeknownst to CAZARES, was working with the Drug Enforcement Administration (the "CI"), at a restaurant located in Chicago, Illinois. Prior to that meeting, CAZARES had informed the CI that he had large quantities of heroin to sell. During that meeting,

CAZARES and the CI discussed buying and selling drugs. More specifically, CAZARES and the CI discussed the price per kilogram and arranged to get in touch again in the future.

On or about August 19, 2008, CAZARES called the CI. During that call, CAZARES and the CI agreed to meet the next day (August 20, 2008) at the same restaurant in Chicago, Illinois. CAZARES also agreed during that call to provide the CI with a "sample" of heroin and said he would be receiving a large supply of heroin within the next few days.

On August 20, 2008, CAZARES again met with the CI at the same restaurant. During that meeting, CAZARES introduced the CI to Individual A. CAZARES and Individual A explained that they did not have any heroin to sell. The CI then told CAZARES and Individual A that he had more than 100 kilograms of cocaine ready for distribution. CAZARES and Individual A agreed to purchase a majority of the kilograms of cocaine and informed the CI that they would have the money ready by the upcoming weekend. The CI advised CAZARES and Individual A that he needed to speak to his supplier regarding the transaction.

On August 22, 2008, the CI again met CAZARES and Individual A, this time at a restaurant located in Berwyn, Illinois. During that meeting, the CI introduced CAZARES and Individual A to his supplier, who, unbeknownst to CAZARES and Individual A, was an undercover agent with DEA (the "UC"). CAZARES and Individual A agreed to purchase 25 kilograms of cocaine in the upcoming week. Specifically, CAZARES said they were "ready to work," and "ready to do what we have to do." CAZARES also said there were

3

people in addition to Individual A who were helping him with the deal. The UC asked CAZARES, "how many do you need right now?" CAZARES responded, "25 by Saturday." The UC told CAZARES and Individual A that it would be anywhere from a day to a week that the cocaine shipment would arrive. He instructed CAZARES and Individual A to get their money ready in the meantime.

Later that night, the CI contacted CAZARES by telephone and advised him that the cocaine shipment would be arriving in Chicago either on Sunday night (August 24, 2008) or sometime Monday (August 25, 2008).

On August 23, 2008, the CI again met with CAZARES at the same restaurant located in Chicago, Illinois, where they had met several days earlier. During this meeting, the CI confirmed that the cocaine shipment was en-route to Chicago. CAZARES told the CI that he and others were ready to purchase the 25 kilograms of cocaine.

On or about August 25, 2008, CAZARES called the CI and said he wanted to talk. The CI and CAZARES then again met at the same restaurant in Chicago, Illinois. During that meeting, the UC contacted the CI, who passed the phone to CAZARES. CAZARES and the UC then arranged for the sale of the 25 kilograms of cocaine. They scheduled the transaction for the next day, August 26, 2008. The UC told CAZARES that the cocaine would be ready for distribution by 6:00 p.m. to 6:30 p.m. on Tuesday (August 26, 2008). CAZARES again told the UC that they were ready to purchase the cocaine.

Individual A was also present for this meeting. During the meeting, Individual A told the CI that they have a person with the money, that the person could be in Chicago the next day, and that they would be bringing the money in a car with a trap. Individual A explained that they needed a garage since the money was being transported in the trap. The CI and Individual A also discussed the price. The CI said, "It's going to be 525,000 right?," referring to the total cost of 25 kilograms of cocaine. Individual A responded, "with the 21?," referring to the fact that the purchase price of the 25 kilograms of cocaine was to be $21,000 per kilogram.

On August 26, 2008, the UC called CAZARES. During that call, CAZARES told the UC that the money was en-route to Chicago and that it would arrive later that same night. The money CAZARES referred to is the money for the purchase of 25 kilograms of cocaine. Later that same day, the CI called CAZARES. During that call, CAZARES told the CI that he had spoken with the CI's "boss" and that everything was fine. CAZARES advised the CI that the individuals delivering the money would be in Chicago that night and that they would drive to CAZARES's "cousin's" house.

On August 27, 2008, the UC called CAZARES. During that conversation, the UC told CAZARES that he was expecting a shipment of cocaine to arrive in Chicago on Thursday, August 28, 2008. CAZARES told the UC that individuals from New York had arrived in Chicago with the money to purchase the 25 kilograms of cocaine. The UC and CAZARES agreed to conduct the transaction on Friday, August 29, 2008, between 9:00 a.m.

5

and 10:00 a.m. During this conversation, the UC also informed CAZARES that he would provide CAZARES with $500 for the unidentified individuals from New York to stay in Chicago until Friday. At approximately 6:00 p.m., the CI met with CAZARES at the restaurant in Chicago, Illinois, and provided him with $500.

On August 29, 2008, the CI and UC again spoke to CAZARES. During those conversations, they agreed to meet at the same restaurant in Chicago, Illinois. Once they arrived at the restaurant, the CI and CAZARES spoke briefly in the parking lot. During that conversation, the CI asked CAZARES, "how much?" CAZARES responded, "It's half a million and twenty five," referring to $525,000, the total purchase price for the 25 kilograms of cocaine. CAZARES also specified that "other people are going to take twenty-three" and that CAZARES was going to take "the other two." The CI then said that he wanted to see the money.

CAZARES and the CI then got into their respective vehicles and drove to a location near 49th Street in Chicago, Illinois. At that time, CAZARES got into the CI's vehicle. From there, the CI and CAZARES traveled to a detached garage located at 4910 S. Kildare Avenue. When they arrived at the address, the CI asked CAZARES, "where do they have it? The money." CAZARES responded, "Right here in the house."

CAZAREZ and the CI then entered the garage. There were approximately six or seven other individuals, including Individual A, already present in the garage. CAZARES introduced the CI to Individual B, who told the CI that he was ready and that "I haven't even

rested because I had to find a flight to come early." While Individual B was talking to the CI, Individual C was prying the mounting bolts off of the drivers-side seat of the Volvo, in order to access the trap containing the money. Individual B then said, "Okay, it's set." CAZARES said, "It's set. We're going to pick that up right now," meaning that since the money is ready, he and the CI can pick up the cocaine. The CI said, "Alright then. Then, we'll be back, okay?," indicating that the CI would be going to pick up the 25 kilograms of cocaine. The CI and CAZARES then left the garage in order to pick up the purported 25 kilograms of cocaine.

The Volvo contained approximately $634,880 in the hidden compartments. There was also $31,838 located in the residence at 4910 S. Kildare. The money hidden in the Volvo and at the Kildare residence was the money intended to be used for the purchase of the 25 kilograms of cocaine.

## Maximum Statutory Penalties

7. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

    a. A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $4,000,000. Defendant further understands that the judge also

must impose a term of supervised release of at least five years, and up to any number of years, including life.

      b.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

8.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

9.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

      a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2008 Guidelines Manual.

      b.     **Offense Level Calculations.**

          i.     The amount of cocaine involved in the offense for which defendant is accountable was at least 15 kilograms, but less than 50 kilograms of cocaine.

Therefore, the base offense level for the offense of conviction is 34, pursuant to Guideline §2D1.1(a)(3) and (c)(3);

        ii.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

        iii.    In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

    c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 6 and defendant's criminal history category is III:

i. On or about March 21, 2005, defendant was convicted of conspiracy to possess with the intent to distribute cocaine in the United States District Court for the Northern District of Ohio, and sentenced to 63 month's incarceration. Pursuant to Guideline §4A1.1(a), defendant receives three points for this conviction.

ii. Defendant committed the instant offense while under a criminal justice sentence, namely the term of supervised release for the conviction described in paragraph (9)(c)(i). Therefore, pursuant to Guideline §4A1.1(d), defendant receives two additional criminal history points.

iv. Defendant committed the instant offense less than two years after release from imprisonment on the sentence for the conviction described in paragraph (9)(c)(i). Therefore, pursuant to Guideline §4A1.1(e), defendant receives one additional criminal history point.

d. **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 31, which, when combined with the anticipated criminal history category of III, results in an anticipated advisory Sentencing Guidelines range of 135 to 168 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment.

e. Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon

which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

    f.  Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

## **Agreements Relating to Sentencing**

10. The government agrees to recommend that the Court impose a sentence within the applicable guidelines, subject to the statutory mandatory minimum, pursuant to Guideline §5G1.1, and to make no further recommendation concerning at what point within the range sentence should be imposed.

11. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Plea Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

12. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

13. The parties further agree, pursuant to Title 18, United States Code, Section 3583(d), that the sentence to be imposed by the Court shall include, as a condition of any term of supervised release imposed in this case, a requirement that defendant repay the United States $500 as compensation for government funds that defendant received during the investigation of the case.

14. At the time of sentencing, the government will move to dismiss the notice of prior conviction relating to defendant filed pursuant to Title 21, United States Code, Section 851.

15. In exchange for the concessions made by the government herein, defendant agrees to truthfully provide to the government all the information he has concerning the offense of conviction. Such information shall be provided pursuant to a proffer letter with the government and shall not be used against defendant in determining the applicable guidelines range pursuant to Guideline §1B1.8.

**Forfeiture**

16. The indictment charges that defendant CAZARES has subjected personal property to forfeiture, namely a 2004 Volvo VST, VIN# YV1CZ91H641047684; $634,880 in United States currency recovered from the Volvo VST inside the garage at 4910 S. Kildare Avenue, Chicago, Illinois; and $31,838 in United States currency recovered from 4910 S. Kildare Avenue, Chicago, Illinois, as property which constitutes and is derived from proceeds traceable to the offense charged in the indictment, and as property which facilitated the offense charged in the indictment. By entry of a guilty plea to the indictment, defendant acknowledges that the property identified above is subject to forfeiture.

17. Specifically, defendant CAZARES agrees to the entry of a forfeiture judgment in the amount of $525,000, in that this property is subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of

13

ownership he has in funds in the amount of $525,000 and further agrees to the seizure of these funds so that these funds may be disposed of according to law.

18. Defendant CAZARES further acknowledges that on or about September 24, 2008, administrative forfeiture proceedings were commenced against the subject Volvo and both currency seizures, and that he received notice of these proceedings. Defendant CAZARES relinquishes all right, title, and interest he may have in the subject Volvo and the balance of the seized currency, namely, funds in the amount of $109,880 seized from the subject Volvo and funds in the amount of $31,838 recovered from the Kildare property, and understands the property is subject to forfeiture. Further, defendant understands that a declaration of forfeiture has been entered for the subject Volvo and that declarations of forfeiture will be entered for funds in the amount of $109,880 seized from the subject Volvo and for funds in the amount of $31,838 recovered from the Kildare property, extinguishing any claim he may have had in the seized property and he agrees that entry of such decrees is appropriate.

19. Defendant CAZARES is unaware of any third party who has an ownership interest in, or claim to, any of the above described property subject to forfeiture and will cooperate with the United States during the ancillary stages of any forfeiture proceedings to defeat the claim of a third-party in the event a third party files a claim.

20. Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

21. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 08 CR 685.

22. This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

23. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

    a. **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

15

    i.  The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

    ii.  If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

    iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

    iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

    v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would

be able to confront those government witnesses and his attorney would be able to cross-examine them.

    vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

    vii.  At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

  b.  **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 10 days of the entry of the judgment of conviction.

  c.  Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Presentence Investigation Report/Post-Sentence Supervision

24. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing.

25. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

26. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to

and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

27. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

28. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

29. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute

defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

30. Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

31. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

32. Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 10-19-2009

_____   _____
PATRICK J. FITZGERALD              FREDDY CAZARES
United States Attorney             Defendant

_____   _____
BETHANY K. BIESENTHAL              ROSE LINDSAY
Assistant U.S. Attorney            Attorney for Defendant