```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                  Plaintiff,        )   Docket No. 08 CR 685
                                      )
 6             vs.                    )
                                      )
 7   FREDDY CAZARES,                  )   Chicago, Illinois
                                      )   July 26, 2010
 8                  Defendant.        )   10:41 a.m.

 9

         TRANSCRIPT OF PROCEEDINGS - Sentencing
10     BEFORE THE HONORABLE REBECCA R. PALLMEYER

11

     APPEARANCES:
12

13   For the Plaintiff:      HON. PATRICK J. FITZGERALD
                             UNITED STATES ATTORNEY
14                           BY:  MS. MEGAN CHURCH
                             219 South Dearborn, 5th Floor
15                           Chicago, Illinois  60604

16

     For the Defendant:      FEDERAL DEFENDER PROGRAM
17                           BY:  MR. ROSALIE LINDSAY GUIMARAES
                             55 East Monroe Street, Suite 2800
18                           Chicago, Illinois  60603

19

     Also Present:          Ms. Rebecca Fowlie, Probation Officer
20                          Ms. Kathleen O'Hanlon, Interpreter

21

22

23   Court Reporter:        FRANCES WARD, CSR, RPR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2118
                            Chicago, Illinois  60604
25                          (312) 435-5561
                            frances_ward@ilnd.uscourts.gov
```

1    THE CLERK:  08 CR 685, United States versus Freddy

2  Cazares for sentencing.

3    MS. CHURCH:  Good morning, your Honor.

4    Megan Church for the United States.

5    MS. LINDSAY GUIMARAES:  Good morning.

6    Rose Lindsay Guimaraes for Mr. Freddy Cazares, who

7  is present.

8    MS. FOWLIE:  Good morning, your Honor.

9    Rebecca Fowlie with the Probation Department.

10    THE COURT:  The record will show the court

11  interpreter is here.

12    THE INTERPRETER:  Good morning, Judge.

13    Kathleen O'Hanlon, for the record.

14    THE COURT:  Good morning.

15    We are here for sentencing of the defendant on

16  charges to which he pleaded guilty.

17    I have the probation officer's report before me.

18  And I also have the government's submission and materials

19  from Ms. Lindsay as well.  And letters from Mr. Cazares'

20  friends and family members are before me.

21    Is everyone ready to proceed?

22    MS. LINDSAY GUIMARAES:  Yes.

23    THE COURT:  All right.

24    Ms. Lindsay, you have had a chance to review the

25  probation officer's report with your client?

1    MS. LINDSAY GUIMARAES:  Yes, I have, Judge.

2    THE COURT:  Let's begin, then, with the report, and

3    specifically with the probation officer's determinations

4    about the guidelines.

5    I think what Ms. Fowlie has concluded is that

6    Mr. Cazares is at a Criminal History Category III and that

7    his adjusted offense level is 31.

8    Is there any dispute about those figures?

9    I think I saw that the government has no objection;

10   is that right?

11   MS. CHURCH:  That's correct.

12   MS. LINDSAY GUIMARAES:  No objection from us

13   either, Judge.

14   THE COURT:  All right.  I know that originally

15   there was some thought that the government would be seeking

16   the enhanced penalties, but that's been withdrawn.

17   MS. CHURCH:  The government formally moves to

18   withdraw the notice of enhanced penalties.

19   THE COURT:  So then we are looking at -- we begin,

20   then, with the guideline range of Criminal History

21   Category III and Offense Level 31, which gives us a guideline

22   range of 135 to 168 months.

23   MS. LINDSAY GUIMARAES:  That's correct.

24   I am sorry, your Honor.  There was one issue with

25   respect to criminal history that I did want to raise for the

1   Court.

2          We are in agreement with everything that's in the

3   presentence report.  However, I did want to ask the Court to

4   entertain the idea of potentially, on Page 8, omitting the

5   final criminal history point, the recency point, under

6   Subsection (e).

7          Now, that wouldn't change his criminal history

8   category, but the number of criminal history points is a

9   relevant consideration for the Bureau of Prisons in

10  determining security level, things like that.

11         And in light of the Sentencing Commission's recent

12  proposed amendment, which wouldn't go into effect until

13  November 1st if Congress doesn't intervene, the Sentencing

14  Commission currently is -- their current thinking is that

15  this point -- they are going to actually remove that from the

16  guidelines.

17         And they have provided some reasoning for that,

18  suggesting that -- their current studies suggest that this

19  point isn't a fair reflection of a person's potential for

20  recidivism.

21         And I actually have a statement here from the

22  Commission if the Court would like me to read it, just a

23  brief paragraph about the reasoning.

24         THE COURT:  Sure.

25         MS. LINDSAY GUIMARAES:  The Commission has stated

1    that -- this amendment is a result of the Commission's

2    continued review of criminal history issues.  As a part of

3    its review, the Commission undertook analyses to determine

4    the extent to which recency points contribute to the ability

5    of the criminal history score to predict the defendant's risk

6    of recidivism.

7         And they have come up with a conclusion that public

8    comment and testimony indicated that defendants who

9    recidivate tend to do so relatively soon after being released

10   from prison but suggested that for many defendants this may

11   reflect the challenges to successful reentry after

12   imprisonment rather than increased culpability.

13        So that's the Commission's current thought on this

14   additional point.  So I just wanted to raise that for the

15   Judge.

16        I know this is not a part of the current guidelines

17   manual which applies to this sentencing, but under *Kimbrough*

18   and 3553(a), this Court does have the discretion, for policy

19   reasons, to omit that extra point, if the Court sees fit.

20        So I just wanted to raise that issue for the Court.

21        THE COURT:  What's the government's position with

22   respect to that request?

23        MS. CHURCH:  The government opposes that request.

24        The criminal history category points are correctly

25   calculated under the current guideline regime.

1          Additionally, this particular defendant's criminal

2    activity while he was serving his sentence of incarceration

3    that led to this case demonstrates the applicability of that

4    one point.  This wasn't simply a situation of someone kind of

5    lapsing back into criminal behavior somewhere two years down

6    the line.  It was while he was serving his sentence of

7    incarceration at the Salvation Army Center.  Therefore, that

8    point should remain there.

9          THE COURT:  4A1.1 includes a number of provisions

10   for additional points reflecting criminal history.  4A1.1(d)

11   calls for the Court to add two points if the defendant

12   committed the instant offense while he was under a criminal

13   justice sentence.  And that includes probation, parole,

14   supervised release, imprisonment, work release, or escape

15   status.

16         As I understand it, this offense occurred while he

17   was -- while Mr. Cazares was at the Salvation Army; is that

18   right?

19         MS. LINDSAY GUIMARAES:  That's correct.

20         THE COURT:  All right.  And that was a function of

21   his sentence, a halfway house situation?  Or was it

22   supervised release?

23         MS. LINDSAY GUIMARAES:  That was a function of his

24   sentence.  So under Subsection (d) the applicable portion is,

25   add two points if the defendant committed the instant offense

1    while under imprisonment, if you jump to the last line.  So

2    it's technically imprisonment.

3                THE COURT:  But then if you look at 4A1.1(e), that

4    section allows for two additional points if the offense was

5    committed less than two years after release or while in

6    imprisonment or escape status for a previous sentence.

7                If we consider (d) to reflect -- to be appropriate

8    here, then it's difficult for me to see how (e) is not double

9    counting.

10                I recognize that (e) says if two points are added

11    for item (d), add only one point for this item.

12                MS. LINDSAY GUIMARAES:  It appears that the

13    Commission initially was concerned about the time frame of

14    how quickly the new offense occurred.

15                But then the Commission's recent commentary on this

16    recency idea is basically that, well, even if something --

17    even if the defendant did reoffend very quickly after being

18    incarcerated or whatever aspect of the case, the time frame

19    doesn't necessarily reflect increased culpability.  It's

20    often more an instance of just trying to readjust to the

21    community.

22                So that's their current thought on this point.  And

23    that's why, if Congress doesn't intervene, it will be omitted

24    come November 1st.

25                Again, at the end of the day, it doesn't change his

1    criminal history category here.  But for Bureau of Prisons'

2    purposes and just to make his life a little more bearable for

3    the next ten-plus years, it would be -- it could make a

4    difference for him.

5             THE COURT:  I am going to sustain the objection to

6    the additional point for 4A1.1(e).

7             Again, it makes no difference with respect to the

8    total offense -- the criminal history category of III.  And

9    obviously, the total offense level is unaffected by this

10   adjustment as well.  So we are still looking at a guideline

11   range of 135 to 168 months.

12            Okay.  Let's talk, then, about what sentence is

13   appropriate.

14            We can begin with the government.

15            MS. CHURCH:  Yes, your Honor.

16            It is the government's position that a sentence

17   within the advisory guideline range of 135 to 168 months is

18   sufficient but not greater than necessary to accomplish the

19   purposes -- to accomplish the purposes of sentencing and to

20   meet the requirements of Section 3553(a).

21            Everything in this case tells you that Freddy

22   Cazares is a cocaine trafficker.  And I use the word

23   "trafficker" very specifically.  He is not some sort of

24   street-level drug dealer.  He is someone who is moving

25   kilogram quantities of cocaine that are worth hundreds of

1   thousands of dollars.

2           When he is out of prison, that is how he earns his

3   living.  He works with coconspirators to buy and sell kilos

4   of cocaine, cocaine that ends up being distributed to other

5   drug dealers down the line, out into the street and its

6   communities.

7           After he was convicted in federal court in Ohio of

8   moving more than 5 kilograms of cocaine prior to April 22nd,

9   2004, and also delivering approximately 10 kilos of cocaine

10  on April 22nd, 2004, he didn't learn his lesson.  He didn't

11  change his ways.  He went right back to moving kilos of

12  cocaine once he was released from federal prison.

13          This time and in this case, he tried to buy

14  25 kilos of cocaine from a DEA informant.  Those kilos were

15  destined for Chicago and the East Coast.  Worst of all, he

16  did all of this while he was at the Salvation Army, while he

17  was serving his prior federal sentence.

18          He may come before you now and say that he has

19  changed his ways, that he has learned his lesson, but his

20  conduct up to now tells you that that is not the case and

21  that you can't believe it.

22          As a result, a guideline sentence is appropriate.

23          Looking at his history and characteristics, this is

24  not a defendant who necessarily was destined to become a drug

25  trafficker.  He is the product of a two-parent household.  He

1  didn't grow up in extreme poverty.  He grew up close to his
2  siblings, many of whom are here in Chicago.  His parents work
3  in a factory here in Chicago.  His siblings work in a factory
4  here in Chicago.  That, day in and day out, is a tough life,
5  and it's a hard way to earn a living, but it's an honest way
6  to earn a living.

7       He knew how to live honestly and within the law,
8  and he failed to do so time and again.

9       He has also taken advantage of opportunities to
10 change his life while in the Bureau of Prisons.  He already
11 completed a residential drug treatment program.  He took
12 classes on parenting, on his GED, on basic skills like
13 leather and electricity.  He also worked while in the BOP
14 gaining those skills in various capacities doing building
15 patrol, maintenance, electric, and plumbing.

16      And while he was at the Salvation Army, he did have
17 a job.  He was earning 7.50 an hour.

18      At the end of the day, that may not be enough for
19 Mr. Cazares, and that may have been why he returned to drug
20 trafficking.  But that is not an acceptable alternative, and
21 his sentence should speak to that.

22      In terms of the nature and circumstances of the
23 offense, in this particular case, over the course of about a
24 three-week period, this defendant made arrangements with a
25 DEA informant to purchase 25 kilograms of cocaine, just

1   within three weeks.

2           On August 29th there were about seven individuals
3   in a garage on the west side of Chicago who were ready to
4   unload hundreds of thousands of dollars and to reload the
5   kilograms of cocaine from the informant.

6           This defendant made all of that possible.  He was
7   the connect for people on the East Coast and here in Chicago
8   for those kilograms of cocaine.

9           And there can be no doubt what devastating effects
10  drug dealing and, in particular, large-scale drug trafficking
11  has on communities in Chicago and throughout the country.
12  There is no doubt that those 25 kilograms of cocaine that the
13  defendant was trying to buy were destined to be distributed
14  on a street level.

15          There can be no doubt about the violence, the gang
16  activity, and the addiction problems that would correspond
17  with the distribution of those kilogram quantities of
18  cocaine.

19          And this particular defendant knew the devastating
20  effects that distributing cocaine would have on his own
21  personal situation.  He knew that if he got caught with those
22  kilos of cocaine, he wouldn't be spending time with his
23  parents.  He wouldn't be spending time with his family.  He
24  wouldn't be able to take care of his kids.  He knew that
25  because he had already been given that lesson in Ohio.  But

1   he failed to learn from that opportunity.

2           He chose to get back into the game, to run the risk

3   of imprisonment, and without a care as to the consequences of

4   his drug trafficking on others.  His sentence should speak to

5   that.

6           Your Honor knows that you also have to consider the

7   need to deter criminal conduct generally, separate and apart

8   from just this particular defendant.

9           This defendant's sentence should serve as a caution

10  to those individuals who decide that it's a lot easier and

11  faster to make a quick buck moving kilos than it is to work

12  for an hourly wage but honestly.

13          A guideline sentence will deter those other

14  individuals who are contemplating getting into drug

15  trafficking or other criminal conduct more generally from

16  picking up that phone, from making the connection between

17  drug dealers, from distributing cocaine.

18          It is a lot harder to earn 7.50 an hour than to

19  earn thousands of dollars for arranging a few meetings, and

20  his sentence should speak to that.

21          It is also necessary to protect the public from

22  further crimes of this particular defendant.

23          This defendant, while serving his sentence of

24  imprisonment, got involved in this particular criminal

25  activity with 25 kilograms of cocaine.

1        Even while he was at the MCC during this case, he
2   didn't keep his nose clean.  He was convicted of
3   institutional misconduct on October 8th, 2009, over a year
4   after he was arrested in this case.  And he was found guilty
5   of committing an assault.

6        So despite whatever promises he has made in his
7   letter and whatever promises he makes now, he cannot be
8   trusted to return to the community and to live a law-abiding
9   life.  He needs to remain in prison to protect the public
10  from further crimes.

11       Mr. Cazares, through his attorney, also submitted
12  to your Honor information from a psychologist.  And one of
13  the factors that your Honor is to consider is the need to
14  provide the defendant with training, medical care, and
15  correctional treatment.

16       This particular defendant has already made use of
17  various training programs and treatment opportunities while
18  in prison.  In fact, as noted in the PSR, the last time he
19  used alcohol was in April of 2004.  The last time he used
20  cocaine was a few weeks before his arrest in August of 2008,
21  when he said he tried it and realized he couldn't use it
22  anymore.

23       To the extent that he suffers from headaches as a
24  result of the injury that he received from his prior
25  incarceration, he can and will receive whatever medical

1  treatment medical professionals deem necessary.  So that is

2  not a reason to go below the guideline range.

3       I just want to focus your attention on what he is

4  asking for, which is the statutory mandatory minimum of ten

5  years.

6       That applies to conduct involving 5 kilograms of

7  cocaine.  His conduct in this case was worth five times that,

8  25 kilograms.

9       The statutory mandatory minimum in this case

10  doesn't take into consideration that he did commit this

11  activity while he was on -- serving his sentence of

12  imprisonment, that his prior sentence was for drug

13  trafficking, and that it was a significant sentence.

14       Here the guideline range does reflect those

15  considerations, and that is what is appropriate in this case.

16       The government requests a sentence within the

17  advisory guideline range.

18       THE COURT:  Response, Ms. Lindsay?

19       MS. LINDSAY GUIMARAES:  Yes.

20       Your Honor, Freddy does not in any way try to

21  excuse his conduct or try to minimize the seriousness of what

22  he is involved with here.

23       However, I do want to point out a few aspects of

24  the case for the Court to consider in determining what an

25  appropriate sentence is.

1    First of all, with respect to the nature and

2    circumstances of the offense, Mr. Cazares was in the

3    Salvation Army, and an individual who was also there with him

4    approached him and began saying, hey, you know -- began

5    asking if he could help him get involved in the drug trade.

6    According to my client, he was approached by this

7    gentleman numerous times over the course of several months.

8    And every time Freddy said, "No.  I am here to work and take

9    care of my family.  I don't want to get involved again.  I am

10   here at the Salvation Army.  For crying out loud, leave me

11   alone."

12   So according to him, for several months he was

13   repeatedly pestered by this gentleman.  And five and a half

14   months later, after being approached by him in person

15   numerous times while this gentleman was at the Salvation Army

16   and then, when the gentleman was released, on the phone, he

17   was contacted numerous times.  And ultimately he agreed.

18   It took five and a half months to get to that

19   point.  And five and a half months may not seem like a very

20   long time at all, but it's something to show at least where

21   his heart was in the beginning, that he didn't just

22   immediately jump at the opportunity.  It took literally

23   months of saying no to this gentleman.

24   Also, it's my understanding that during this period

25   of time when this gentleman was approaching him at the

1  Salvation Army and then after he was released, there is no

2  evidence of any other transaction being arranged.  So this

3  appears to be the only transaction that there is any evidence

4  of.

5  So I just wanted to point the Court to Page 4 of

6  the presentence report, Lines 50 to 52.  I am concerned that

7  these lines might slightly misrepresent Mr. Cazares' state of

8  mind because here it says, according to Agent Sears, the

9  confidential informant, who was actually introduced -- or my

10  client was put in contact with the confidential informant

11  through the gentleman at the Salvation Army.  Here the agent

12  says that the confidential informant knew the defendant was

13  recently released from prison and had reason to believe that

14  he was looking to get back into the game.

15  It's my understanding that he certainly wasn't

16  looking to get back into the game initially.  But ultimately,

17  he saw an opportunity, saw how little he was making, and also

18  saw that 25 percent of the little amount he was making had to

19  go to the Salvation Army for subsistence payments.  And those

20  pressures and that weakness of giving in to these desires to

21  provide more for his family, he agreed.  And he made a

22  terrible, terrible mistake.  There is no getting around that.

23  So I just wanted to at least point out that I think

24  the presentence report may, in some small way,

25  mischaracterize his initial thoughts about getting involved.

1     With respect to his history and characteristics,

2   it's clear here there were no firearms involved.  And he

3   was -- he does not have violent priors.

4     There are notes here in the presentence report of

5   misconduct in the BOP and Salvation Army.  These appear to be

6   relatively minor incidents.

7     The incident at the MCC, according to my client, he

8   was defending himself.

9     He also has very positive conduct to point to while

10   he has been in custody.  So there is a balance there.

11     The letters that his family and coworker submitted

12   to the Court suggest that there is a positive side of Freddy.

13   He is a hard worker.  He is a responsible worker.  He is a

14   good father.  He loves his children and spends quality time

15   with them when he is able.  And he has been a positive

16   influence on his siblings.  So that's something to say for

17   his character.

18     With respect to his medical condition -- and there

19   is a significant concern here that from the 2007 attack in

20   the BOP, according to the medical records which I reviewed,

21   he did, in fact, have a fractured skull.  And as the Court

22   may be aware, to fracture the skull requires a very

23   significant amount of force.  So he does suffer ongoing

24   piercing headaches, and he feels that his vision and his

25   hearing may be impaired as a result.

1       More importantly, as a result of the attack in the
2   BOP, he is suffering -- as Dr. Machabanski points out in his
3   report, Freddy is suffering increased anxiety, almost
4   paranoia, to the point that he worries about being attacked
5   again.  So his behavior is consistent with that fearful
6   attitude, based on the attack he received.  And he has
7   actually been diagnosed by Dr. Machabanski with posttraumatic
8   stress disorder with respect to this.

9       My biggest concern for Freddy is Dr. Machabanski's
10  analysis of his cognitive abilities.  He actually tested him
11  in the first percentile, as low as it gets, and actually
12  diagnosed him with mild mental retardation.

13      Now, we are not in any way trying to say that his
14  cognitive deficits are an excuse for his behavior, because he
15  is not at all trying to say that he didn't know what he was
16  doing.  He did.  He made a very poor choice.

17      But I do think it's important for the Court to at
18  least consider this diagnosis of the first percentile in
19  terms of cognitive abilities and a diagnosis of mild mental
20  retardation as certainly a way to understand where he was
21  coming from.

22      He had severe difficulties in school.  As a result,
23  suffered severely low self-esteem.  And if we were to even
24  try to comprehend putting ourselves in a situation where we
25  had such limited capacities, in a way, if anything, it helps

1   us to understand the self-imposed limitations he might be

2   living under.  He may be viewing the world as "I'm not able

3   to do anything but get involved in something that doesn't

4   require a stellar résumé or superior interviewing skills."  I

5   mean, we could never understand.  I would imagine that no one

6   else in this room might comprehend what it would be like to

7   live with such deficits.

8           And again, he is not using this as an excuse.  But

9   I do think it informs the Court very clearly as to what he

10  could have been dealing with and how he got to the place he

11  is now.

12          Ultimately, he does deeply regret that he is here

13  again.  He sees that it's a destructive choice he made, not

14  only to himself and his family but to society.

15          And so in terms of asking what is appropriate for

16  deterrence -- deterring him, deterring the community, the

17  need to protect the public, all of those things -- I just

18  simply have to wonder, if Mr. Cazares were exposed to the

19  right special education opportunities and the right

20  psychotherapy and all of those other things that

21  Dr. Machabanski proposes for him, I have to wonder if he

22  wouldn't be able to move forward and improve his life.

23          So I just wanted to ask the Court to consider these

24  things just, if anything, to provide background and

25  understanding as to how he could have made such a poor

1  decision again.

2  And ultimately, I did want to ask the Court if the

3  Court could make a recommendation to the Bureau of Prisons

4  for designation to a medical facility so that he can receive

5  the necessary neurological analysis or whatever else he might

6  need on an ongoing basis to deal with his severe headaches

7  and things of that nature.

8  He is also interested in participating again in the

9  residential substance abuse program.  So if the Court could

10  recommend that as well, that would be great.

11  That's all I have, Judge.

12  THE COURT:  Thank you, Ms. Lindsay.

13  Mr. Cazares, is there anything that you would like

14  to say before sentence is imposed?

15  THE DEFENDANT (through interpreter):  Before I say

16  anything else, I would like to apologize to the Court and to

17  my family that's here and to thank the young lady attorney.

18  And that's all.

19  THE COURT:  All right.  Thank you.

20  Ms. Fowlie did a good job of putting together the

21  report that informs the Court's considerations.  And I did

22  have a chance as well to look at Mr. Cazares' doctor's

23  evaluation of his situation.

24  I, too, was struck by the very limited cognitive

25  abilities that this man has.  And I know getting the head

1    injury a couple of years ago didn't help in the sense that I

2    don't think that it affects his cognitive abilities directly

3    but certainly puts him in a sense -- in a position where he

4    is fearful and also experiences pain.

5            One really can't help but be struck by what a bad

6    decision this man made, not once but twice.  He had, as I

7    understand it, a large and very loving family.  His family

8    members are here.  He has got people who spoke up for him in

9    letters to the Court.  And he has the love of his children

10   even now.

11           He had a wonderful opportunity, really, when he was

12   placed in the Salvation Army facility here.  In fact, the

13   Salvation Army facility has done so much for prisoners upon

14   their release from custody by making work available to them

15   and helping them to recognize good habits.

16           I understand that while he was there, he was

17   approached by somebody with bad intentions.  And I can't help

18   but believe that the Salvation Army staff recognize that this

19   kind of thing can happen and surely communicated to

20   Mr. Cazares that the thing to do, if that were to happen,

21   would be to bring that up with a staff person or a counselor

22   of some kind.

23           Now, maybe Mr. Cazares had the idea that that was

24   somehow unsportsmanlike or somehow not friendly.  But whoever

25   this was certainly wasn't supposed to be involved in drug

1  trafficking.  And for him to approach Mr. Cazares or anybody

2  else was wrong.  And Mr. Cazares had a responsibility to

3  speak up, not only to say no, but also to speak up.  This man

4  was doing -- was violating the law.  And it's the

5  responsibility of a good citizen to make sure that that

6  doesn't happen.

7          What happened instead in this case is, after a

8  period of time, as I understand it, Mr. Cazares' resistance

9  broke down and he agreed to become involved in what the

10  government points out is a very substantial amount of

11  cocaine.  This wasn't -- this was substantially more than

12  what would trigger the mandatory minimum in this case.

13          To say it was a foolish decision just doesn't

14  express well how ill-advised this whole scheme was.

15          And the fact that Mr. Cazares suffers from real

16  cognitive deficits suggests that -- the circumstances sort of

17  cuts both ways in the sense that it might excuse his -- or

18  might serve as an explanation for his belief that perhaps

19  this kind of drug trafficking is the only way he could

20  effectively make money.

21          On the other hand, it suggests that he is going to

22  be very difficult to educate.  He certainly should have --

23  could have learned from experience and could have learned

24  from the Salvation Army atmosphere.  But what he did was

25  squander the really excellent opportunity he had in that

1   facility and with that job by becoming involved once again in

2   drug trafficking.

3            All of those considerations suggest to the Court

4   that a guideline sentence is appropriate here.  The range is

5   135 to 168 months.

6            I am going to impose a sentence of 140 months in

7   custody to be followed, of course, by supervised release,

8   which I will talk about in a moment.

9            It's a long time for Mr. Cazares to go away.  I

10  know that during his previous period of incarceration, he was

11  able to use that time somewhat effectively in the sense that

12  I understand that's when his reading and writing abilities,

13  limited as they are, were served well.  While he was in

14  custody, he actually learned a little bit more reading and

15  writing than he had before.  So I am hoping that further

16  education possibilities will be available to him.

17           I will, of course, recommend that he be placed in a

18  medical facility, as requested, and that he receive the

19  comprehensive mental health and residential substance abuse

20  treatment that is available through the Bureau of Prisons.

21           The supervised release range is a minimum of ten

22  years.  And I will impose the guideline ten-year supervised

23  release.

24           During that period of time, Mr. Cazares, you should

25  report -- first, promptly report to the probation officer

1    within 72 hours of your release from custody and thereafter

2    abide by all the conditions that are imposed by the court on

3    persons under supervised release.

4            Those include that you not commit an offense of any

5    kind; that you remain -- or that you report to the probation

6    officer as directed; that you refrain from any excessive use

7    of alcohol and from any unlawful drug use of any kind; that

8    you cooperate with a collection of a DNA sample; that you not

9    possess a firearm or destructive device.

10           And I am going to direct that you participate in

11   drug aftercare as well as treatment and testing, at the

12   direction of the probation officer, up to 104 tests per year.

13           You will participate, while you are on supervised

14   release, in continued efforts to earn a GED, unless you are

15   able to get that accomplished while you are in custody.

16           I am also going to impose the requirement that you

17   pay $500 to the DEA.  Those are the buy money, the government

18   funds that were used in the investigation.

19           MS. CHURCH:  Your Honor, $400 of that was seized by

20   DEA at the time of his arrest.

21           THE COURT:  So it's just $100.

22           MS. CHURCH:  I believe so.

23           THE COURT:  All right.

24           There is also the $100 special assessment that's

25   payable immediately.

1    And I am going to impose a modest fine of $400 in
2    this case.

3    So it's a total -- then, it would be $600:  The
4    $100 special assessment, the $400 fine, and the $100 payable
5    to the Drug Enforcement Administration beyond what was
6    already seized.

7    I am going to direct that Mr. Cazares obtain --
8    seek and obtain employment as a condition of supervised
9    release.  For any 60-day period in which he is unable to find
10   work, I will require that he perform community service of
11   20 hours per week.  Sometimes community service is itself a
12   way of finding a good job.  But whether it is or it isn't, in
13   this case I want to make sure that Mr. Cazares is engaged in
14   productive activity because I think being idle is not good
15   for anybody, but certainly not good for anybody who has got a
16   history of criminal activity.

17   I do need to talk with Mr. Cazares about his appeal
18   rights.

19   Are there any other matters that we should review?
20   MS. CHURCH:  Yes, your Honor.  There is also the
21   matter of forfeiture.

22   A preliminary order of forfeiture was entered by
23   the Court on December 16th of 2009.  It needs to be
24   pronounced at sentencing.  And then the preliminary order
25   needs to be attached to the J and C.

1        THE COURT:  Is that the $400?

2        MS. CHURCH:  It's the $525,000 that was seized from

3    the Volvo SUV at the time of the reverse.  The defendant has

4    already agreed to the preliminary order of forfeiture.  It

5    just needs to be pronounced.

6        THE COURT:  The Court will, then, order forfeiture

7    of those funds that were seized from the SUV at the time of

8    the arrest.

9        MS. LINDSAY GUIMARAES:  Your Honor, I had one

10    question with respect to supervised release.  It's my

11    understanding that there is a minimum supervised release of

12    five years if the 851 notice is withdrawn.

13        THE COURT:  You are correct.

14        MS. LINDSAY GUIMARAES:  I just wanted to clarify,

15    did the Court intend to still do the ten years?

16        THE COURT:  You are correct.  I do, however, think

17    that ten years of supervised release is reasonable for

18    Mr. Cazares in light of his history.

19        Is there anything further besides appeal rights?

20        MS. LINDSAY GUIMARAES:  I can't think of anything,

21    Judge.

22        MS. CHURCH:  I can't either, your Honor.

23        THE COURT:  Mr. Cazares, you are entitled to take

24    an appeal from my sentence.  If you wish to do so, your

25    notice of appeal should be filed within 14 days.  If you are

1    unable to file a notice of appeal on your own, the court

2    clerk will file a notice of appeal on your behalf.

3         Good luck to you, sir.  Thank you.

4         (An adjournment was taken at 11:16 a.m.)

5                    *    *    *    *    *

6    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
7

8    /s/ Frances Ward                    September 2, 2010.
     Official Court Reporter
9    F/j

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25